IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| In The Matter of The Search of The Cellular Telephone Assigned Call Number 603-507-5750. | Case No.   2:20-MJ-133 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael J. McCormack, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 603-507-5750 ("the Target Cell Phone"), believed to be in the possession of Markus Anthony SAEZ a/k/a "Stacks," whose provider is T-Mobile USA, a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a detective employed by the Winooski Police Department, and I am also assigned to the Drug Enforcement Administration, Burlington Resident Office, as a Task Force Officer. As a DEA Task Force Officer, I am a "federal law enforcement officer" as defined in Federal Rule of Criminal Procedure 41(a)(2)(C), authorized to investigate violations of the United States Code under Titles 18 and 21, to include applying for search warrants.

4. I have been a law enforcement officer for over four years. I earned Vermont Criminal Justice Training Council certification as a part-time law enforcement officer in or about June of 2016, and earned certification as a full-time law enforcement officer in or about May of 2017, following graduation from a four-month academy. During that time, I served as a Chittenden County Deputy Sherriff starting in June of 2016, and joined the Winooski Police Department as a police officer in March of 2018, where I currently serve as a detective. Throughout my law enforcement career, I have received specialized training including training concerning drug investigations and drug identification. In my experience as a law enforcement officer, I have participated in drug investigations that included conducting surveillance, developing and employing confidential sources, conducting controlled purchases of drugs, applying for search and arrest warrants, and executing such warrants. I have interacted with, arrested and interviewed individuals involved in the illicit drug trade ranging from drug users to distributors. Based on my training and experience, I know it is common for individuals involved in the illicit drug trade to use aliases to conceal their true identities. Additionally, I know based on my training and experience that individuals involved in the illicit drug trade often choose to use prepaid cellular phones which do not verify subscriber information and that, therefore, individuals involved in the illicit drug trade will often provide false or fictitious information when subscribing to cellular

services. Further, through my work relating to drug investigations, I have become familiar with packaging typical of certain drugs as sold to users, including cocaine base, heroin and fentanyl.

5. The facts in this affidavit come from my personal observations, my training and experience, my review of documents, records, and reports pertaining to this investigation, and information obtained from other members of law enforcement and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 21 U.S.C. §§ 841(a), 846, and 843(b), concerning distribution of and conspiracy to distribute heroin and cocaine base, and the use of a communication facility to commit, cause, and facilitate such distribution and conspiracy, have been committed, are being committed, and/or will be committed by SAEZ and/or others associated with the Target Cell Phone. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B. Further, there is probable cause to believe that the Target Cell Phone has been used and will be used as an instrumentality of the offenses listed above. Accordingly, there is probable cause to believe that location information relating to the Target Cell Phone will constitute or lead to evidence of such crimes, fruits of such crimes, or instrumentalities of such crimes.

7. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

8.      The Drug Enforcement Administration is conducting a criminal investigation concerning the conduct of SAEZ and others regarding violations of 21 U.S.C. §§ 841(a), 846, and 843(b) through the distribution and/or conspiracy to distribute controlled substances, as well as the use of communication facilities to facilitate such distribution and conspiracy.  During this investigation, which began in or about September of 2020, SAEZ, apparently also using the aliases "Stacks" and "Braylon Makai," sold suspected heroin and/or fentanyl and suspected cocaine base in the course of controlled purchases involving the Target Cell Phone.  As set forth below, both controlled purchases were arranged by cooperating subjects who contacted the seller via the Target Cell Phone and involved a male in a red Toyota Camry bearing Connecticut registration AW67223.  I have reviewed a Connecticut Department of Motor Vehicles photograph of SAEZ, a Newport (Rhode Island) Police Department booking photograph of SAEZ, and a Facebook photograph for "Braylon Makai," and believe "Braylon Makai" is SAEZ (i.e., that the individuals depicted in these three photographs are one and the same person).

First Controlled Purchase

9.      On or about October 19, 2020, DEA Task Force Officer Philip Tremblay and Detective Mellis, with the Burlington Police Department, spoke with a subject who had previously completed controlled purchases for, and had previously entered into a Cooperating Subject agreement with, the Burlington Police Department.  This subject ("CS2") said it was interested in providing information and cooperating with law enforcement.  CS2 was told by members of law enforcement that CS2 could face criminal charges if it provides false information to law enforcement.  CS2 renewed its Cooperating Subject agreement with the Burlington Police Department and agreed to assist law enforcement in exchange for monetary compensation.

10. CS2 has worked with law enforcement previously, including with members of the Burlington Police Department, and has provided reliable information and made several controlled drug purchases that resulted in the arrest and prosecution of multiple individuals for drug offenses in Vermont. I have reviewed CS2's criminal history, and believe it has had the following criminal convictions in the past 10 years: Simple Assault, two violations of probation, violation of conditions of release, Conspiracy to Distribute Narcotics, and Conspiracy to Distribute Heroin and Fentanyl, Distribution of Cocaine and Cocaine Base. Prior to 2009, CS2 had the following criminal convictions: Vehicle Operation-Without Owner Consent, Vehicle Operation-Careless or Negligent, Distribution of Cocaine and Cocaine Base, three convictions for Distribution of Cocaine Base, Cocaine Sell, Resisting Arrest, Sexual Assault-Victim <16 Yrs, False Pretenses or False Tokens < $25 attempt, Alcohol-Sale/Furnish to Minor, two convictions for Simple Assault, Petit Larceny, Forgery-Utter/Publish an Instrument, Littering/Dumping, and Unlawful Mischief.

11. Also in October of 2020, CS2 told TFO Tremblay and Detective Mellis that it was in a position to purchase cocaine base and/or heroin from a male it knew as "Braylon Makai." CS2 learned the male's name via the Facebook website, and did not know if this was the male's real name. CS2 stated it did not know any other name for this male. CS2 described "Braylon Makai" as a short and stocky male, possibly Puerto Rican based on his skin tone, with some facial hair. CS2 stated that it had a contact number for "Braylon Makai" of 603-507-5750 (i.e., the call number associated with the Target Cell Phone) and that it had known the male to be in the Chittenden County, Vermont area for approximately a month. CS2 further said that it had previously met with this male to purchase illegal drugs. Investigators later acquired a photograph from the Facebook profile of "Braylon Makai," associated with the url, https://www.facebook.com/braylon.makai.

12.     On or about October 19, 2020, CS2 met with TFO Tremblay and Detective Mellis and advised it was in a position to purchase cocaine base and/or heroin from "Braylon Makai." CS2 was searched prior to the drug transaction, and no illegal drugs, paraphernalia, or large sums of money were found on its person. CS2 was provided serialized U.S. currency to complete the anticipated drug transaction.

13.     CS2 was in contact with "Braylon Makai" while in the presence of investigators via phone calls and text messages to the Target Cell Phone, as well as via Facebook, to arrange the drug transaction. Investigators requested that CS2 attempt to purchase heroin. "Braylon Makai" agreed to meet CS2 at a location in Burlington, Vermont. Members of law enforcement deployed a surveillance team to the area where the drug transaction was expected to be conducted.

14.     CS2 was meanwhile kept under surveillance by TFO Tremblay, Detective Mellis, Detective Sergeant Nguyen, Detective Vivori, and Detective Ellerman, of the Burlington Police Department, as CS2 arrived at the location where the drug transaction was expected to occur.

15.     The meeting between CS2 and "Braylon Makai" was not observed by investigators. However, members of law enforcement saw a maroon Toyota Camry sedan bearing Connecticut license plate AW67223 entering the area of the meeting location and leaving the area shortly after CS2 arrived. CS2 was kept under visual surveillance following the controlled purchase continuously until CS2 met with TFO Tremblay and Detective Mellis. CS2 then handed Detective Mellis suspected heroin that it stated it had purchased from "Braylon Makai."

16.     CS2 was searched after the controlled purchase and was found to have no illegal drugs, paraphernalia, or large sums of money, other than the heroin it provided to Detective Mellis.

17.     Following the controlled purchase, TFO Tremblay conducted a sworn audio-recorded statement with CS2 regarding its drug transaction with "Braylon Makai." CS2 said that

it arranged to purchase heroin via phone calls, text messages, and social media contact with "Braylon Makai," then went to the agreed-upon location and exchanged the U.S. currency DEA had provided to it for heroin from "Braylon Makai," who was in a maroon sedan with a Connecticut license plate.

18. At the Burlington Police Department, Detective Vivori photographed the suspected heroin, and Detective Mellis field-tested a small amount using a SIRCHIE NARK II Fentanyl Reagent kit. The substance field-tested positive for the presence of fentanyl. It was put into evidence at the Burlington Police Department under tag number 70471.

## Second Controlled Purchase

19. In addition to the controlled purchase involving CS2, this investigation involved a controlled purchase conducted by another Confidential Source ("CS"). On a known date in September 2020, CS told DEA Special Agent Timothy Hoffmann that a male known as "Stacks" was distributing heroin and cocaine base. CS provided the call number associated with the Target Cell Phone, 603-507-5750, as contact information for "Stacks."

20. CS provides information and assists law enforcement in exchange for monetary compensation. CS has assisted the DEA and local law enforcement agencies on multiple occasions, including with successful controlled purchases of narcotics. I have reviewed the criminal history of CS, and believe CS has the following criminal convictions: simple assault on a law enforcement officer-bodily injury; assault on a corrections officer; two convictions for simple assault; two convictions for disorderly conduct; retail theft; providing false information to law enforcement - implicating another; vehicle operation-license suspended #1; driving under the influence; and three misdemeanor cocaine possession convictions.

21.     On or about October 20, 2020, CS met with me and SA Hoffmann in Burlington, Vermont. During this meeting, SA Hoffmann showed CS a Connecticut Department of Motor Vehicles photograph of SAEZ and asked CS who the person in the photograph was. CS said the person in the photograph was "Stacks" and that CS knew "Stacks" as a person from whom CS could purchase drugs. At the direction of, and in the presence of SA Hoffmann and me, CS called the Target Cell Phone to arrange to buy drugs. This call was recorded and witnessed by SA Hoffmann and me. SA Hoffmann told CS to ask for a certain quantity of heroin and cocaine base, which CS did. CS confirmed during the call a time and location to meet the seller in order to exchange money for drugs. I searched CS prior to this anticipated transaction. No drugs, drug paraphernalia, or large sums of U.S. currency, other than DEA-provided "buy money" for the drug transaction, were in CS's possession. CS was provided enough serialized U.S. currency to complete the drug transaction. CS was also equipped with audio/video recording devices and an audio transmitting device to enable members of law enforcement to monitor the transaction.

22.     CS went to the location where it had arranged to purchase drugs on its call to the Target Cell Phone. SA Hoffmann and I monitored CS as CS traveled towards the meeting location. At one point, we briefly lost sight of CS, but, moments later, DEA TFO Frank Scalise observed CS arrive at the meeting location. After CS arrived at that location, CS waited some time past the agreed-upon meeting time for the seller to arrive. SA Hoffmann then prompted CS to call the Target Cell Phone to ask when the seller would arrive. When CS placed that call, I was able to hear, via the audio recorder/transmitter with which CS was equipped, CS speak with what sounded like a male voice. The person speaking with CS said he would be there shortly.

23.     CS called the Target Cell Phone several times, as the seller had not arrived by the agreed-upon time. CS again spoke with a male, who told CS he would arrive soon. Shortly after

that call, Detective Mellis observed a red Toyota Camry bearing Connecticut registration AW67223 traveling towards the meeting location. SA Hoffmann and I observed the Toyota as it turned into the arranged meeting location. When the Toyota drove by my location, I saw at least three people inside: a person wearing a grey hooded sweatshirt, driving; a white female with blond hair in the front passenger seat; and a rear passenger whose appearance was concealed by a mask and hooded sweat shirt.

24. Members of law enforcement observed the Toyota slowly drive to the meeting location and stop. I observed CS interacting with the Toyota's driver. I also heard, via the audio recorder/transmitter with which CS was equipped, that CS was speaking with a male occupant of the Toyota. Towards the beginning of CS's interaction with the driver, members of law enforcement observed the rear passenger exit the Toyota and walk slowly away from the meeting location, seemingly scanning the surrounding area. This appeared to be a counter-surveillance technique, as the passenger appeared to be acting as a "lookout" while CS was speaking with the driver. CS then bought drugs from the driver, and CS and the Toyota both departed the location.

25. Immediately following the drug transaction, CS went to another location to meet with SA Hoffmann and me. At that location, CS gave us suspected heroin and suspected cocaine base it had purchased from the Toyota's driver. CS was searched after the controlled purchase and was found to have no other drugs, drug paraphernalia, or large sums of currency. CS advised that the operator of the vehicle was "Stacks" (i.e., SAEZ), and that it had exchanged with SAEZ the U.S. currency provided to CS by DEA for the suspected heroin and suspected cocaine base. The information CS provided to us regarding this transaction was consistent with the recording captured by the audio/video devices that I reviewed, and with observations from the surveillance team monitoring the transaction.

26. The suspected heroin and suspected cocaine base were photographed and processed as evidence. Due to concerns that the suspected heroin was mixed with fentanyl, it was not field tested for safety reasons. Based on my training and experience, however, the suspected heroin was packaged in a manner consist with the packaging used by drug traffickers to distribute heroin and/or fentanyl, and the substance's color and consistency appeared to be that of heroin and/or fentanyl. The suspected cocaine base was field tested by DEA TFO Chis May, who used a Thermo Scientific TruNarc to test the substance. It returned a presumptive positive result for the presence of cocaine base.

27. I also learned from TFO Scalise that he called the registered owner of the Toyota referenced above, which was a rental car agency with an address in Hartford, Connecticut. I reviewed information the rental car agency provided to TFO Scalise and which TFO Scalise in turn provided to me on or about October 21, 2020. According to the rental car agency, their Toyota Camry bearing Connecticut license plate AW67223 was rented to Markus SAEZ, with a vehicle check-out date of September 30, 2020, and a scheduled vehicle return date of October 23, 2020.

### Target Cell Phone's Provider Information

28. On or about October 21, 2020, DEA Intelligence Research Specialist Anna Kendall provided me with information from T-Mobile USA obtained pursuant to an administrative subpoena. Among other things, this information indicated that the provider for the Target Cell Phone (i.e., for the phone associated with the call number 603-507-5750) was T-Mobile USA, and that the customer name associated with the T-Mobile USA account relating to the Target Cell Phone was "Braylon Macai [sic]."

Background Regarding Cellular Devices and Drug Trafficking

29.     In my training and experience, I have learned that T-Mobile USA is a company that provides cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

30.     Based on my training and experience, I know that T-Mobile USA can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile USA's network or with such other reference points as may be reasonably available.

31.     Based on my training and experience, I know that T-Mobile USA can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1)

the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile USA typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

32. Also based upon my training, experience, and conversations with other law enforcement officers, I know that:

    a. An individual's cell phone is often an indispensable piece of technology that is regularly carried on a person whenever the person is out of their dwelling and engaging in society. The location of a person's cell phone at any given point in time may therefore be probative of the person's actual location at that time.

    b. Today's cellular telephone is a data rich personal computer that has become integrated into a person's everyday communication habits. People utilize these phones not only to place and receive voice calls, but also to communicate via text message, email, instant chat, and internet-based social media services. People routinely use their phones to conduct other internet-based activities such as banking and accessing news media sites.

    c. Individuals involved in the commission of criminal acts, much like the broader population, typically utilize their cellular phones as productivity tools, communication tools, and for personal amusement. Persons who commit crimes together often use cellular phones to plan criminal activities, coordinate the execution of criminal activities, and discuss the aftermath of those activities. Persons who commit crimes, whether with co-conspirators or alone, often utilize cellular phone technology to discuss their crimes with others, and to share information regarding the police's knowledge (or lack thereof) of such crimes.

    d. Dealers in regulated drugs have conversations with their sources of supply, customers, and other individuals associated with illicit drug trafficking. These

conversations are related to the processing, transportation, storage, ordering, sale and distribution of controlled substances. Dealers in regulated drugs will engage in these conversations over the telephone or in person, commonly from their residence, place of employment, or other locations where they might have an expectation of privacy. Often sales of regulated drugs are set up through telephone calls before person to person contacts and sales are made. These communications often occur on the telephone, or via text message, email, instant chat, and internet-based social media services.

e. Dealers often control or direct the location of where the meetings or conversations will occur. The dealer will often attempt to move the meeting site with little or no notice. This is done in an attempt to avoid monitoring and detection by the police.

f. The sale and distribution of drugs is an ongoing enterprise. During the course of a criminal investigation there are often more than one meetings between an undercover officer, Cooperating Subject ("CS") or drug customer and the target(s) of the criminal investigation. At these meetings the target and the officer//CS/customer will discuss criminal activity.

g. In order to keep track of their illegal enterprises drug traffickers use cell phones, smart phones, computers or other electronic devices, which they usually maintain at their residences or on their persons to track drug business transactions. Drug traffickers utilize their cell phones, smart phones, computers or other electronic devices to maintain updated address and telephone directories of their customers. Drug traffickers utilize their cell phones, smart phones, computers or other electronic devices to monitor such things as recent and historical sales, proceeds from these sales, the quantities of drugs that are sold, ordered and purchased in the course of their operation, and of transactions that lead to outstanding debts from their customers. Drug dealers also communicate with their sources of supply using this technology.

h. Dealers often frequently change the locations where they stay and/or sleep, frequently several times a day. They do this to avoid detection by law enforcement or because of other unforeseen logistical reasons. It is also common for drug dealers

to sell drugs from one location but sleep and/or stay at another location; to avoid detection by law enforcement.

  i. Dealers usually keep their cell phones on their persons for several reasons, including: to keep in constant contact with their customers and sources of supply, to prevent the phones from being stolen and to avoid others from accessing their phones.

  j. It is possible for dealers (and the general public) to obtain a new cell phone and have the carrier "port" the same phone number over to the new phone. The new phone may have different identifying numbers including the ESN (Electronic Serial Number), MEID (Mobile Equipment Identification), IMEI (International Mobile Equipment Identify) and IMSI (International Mobile Subscriber Identify) but be associated with the same phone number the customer originally had.

## AUTHORIZATION REQUEST

33. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). I request that the proposed warrant allow the government to obtain prospective location information for a period of thirty (30) days. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the Target Cell Phone, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123(c)(1).

34. This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." In this case, such an order would be appropriate because the warrant relates to an ongoing criminal investigation that is

neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation.

35. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

36. I further request that the Court direct T-Mobile USA to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile USA. I also request that the Court direct T-Mobile USA to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile USA's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile USA's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The

government shall reasonably compensate T-Mobile USA for reasonable expenses incurred in furnishing such facilities or assistance.

37. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

38. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## CONCLUSION

39. Based on the forgoing, I respectfully request that the Court issue the proposed warrant.

Dated at Burlington, Vermont, this 5th day of November, 2020.

_____
Michael J. McCormack
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on this 5th day of November, 2020.

HON. JOHN M. CONROY
United States Magistrate Judge
District of Vermont